UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ERNEST ROGERS,

                                Petitioner,                  **DECISION AND ORDER**

            -vs-                                  No. 02-CV-6667

GLENN S. GOORD,

                          Respondent.

_____

## INTRODUCTION

Ernest Rogers ("Rogers") filed this *pro se* petition for a writ of habeas corpus pursuant to

28 U.S.C. § 2254 challenging his conviction in Niagara County Court on one count of second

degree (felony) murder and one count of first degree robbery. The parties have consented to

disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(b).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On the morning of July 23, 1992, Rogers' step-father-in-law Roy Belmont ("Belmont")

was found dead in his home, bludgeoned to death with a tire iron. According to Belmont's step-

grandson, who had been at Belmont's house earlier that evening, the victim had a wallet full of

cash. No wallet was found on the body, however.

Later that afternoon, the police went to Rogers' home where they found him on his way to

work for a cab company. The officers asked him to come down to the station to answer some

questions, and Rogers agreed. Once there, Rogers initially denied being present at the victim's

house on the night of July 22. When confronted with witnesses' statements placing him at

Belmont's house, Rogers did not respond at first. When the officers asked him again, he stated that he had last seen Belmont three months ago at Belmont's wife's funeral. After being confronted with the witnesses' statements for a third time, Rogers changed his story again, stating that he and his wife had argued that night, that she left the house, and that he went looking for her.

During the interview, the police noticed blood-stains on Rogers' sneakers, the soles of which appeared to be freshly washed and discolored as if they had been bleached. The officers confiscated his shoes and asked permission to search his vehicle and his house. No tire iron was found in Rogers' vehicle, nor was the victim's wallet  ever was located. However, the police recovered blood-stained clothes from their search of Rogers' house. The police subsequently obtained a warrant to collect fingernail scraping from Rogers; laboratory testing revealed traces of human blood.

On the night of July 23, the police arrested Rogers and charged him with three counts of second degree murder (intentional murder, felony murder and depraved indifference murder), one count of first degree robbery, and one count of fourth degree criminal possession of a weapon.

Following a suppression hearing, the trial court found that the police officers' initial confrontation with Rogers in the driveway of his home did not exceed the scope of a permissible stop under the Fourth Amendment. The court also found that Rogers voluntarily surrendered his shoes to the police and consented to the search of his vehicle and home. All of Rogers's statements to the police and the physical evidence seized, including the blood-stained sneakers, were held to be admissible.

Rogers's first trial ended in a mistrial, the circumstances and legal implications of which

will be discussed below. At the second trial, Rogers was tried before a jury in Niagara County Court (Hannigan, J.). At trial, Edmund Davey ("Davey"), Belmont's step-grandson, testified that he had seen Rogers at Belmont's house on the evening of July 22. Belmont introduced Rogers to Davey as "Davey's Uncle Ernie." According to Davey, the two men were discussing future plans to take Belmont, who was going away on vacation at some point, to the airport.

Two of Davey's friends, Anthony Bennett ("Bennett") and Charles Congi ("Congi"), also were at Belmont's residence that evening. Davey testified that they had ordered a pizza, and Belmont had paid for it. According to Davey, Belmont had a "wad" of cash in his wallet. After watching a rented movie, Davey, Bennett and Congi left the house at about 9:00 p.m. Rogers was still there when they left.

On the morning of July 23, Davey went over to Belmont's house to mow the lawn. When his step-grandfather would not answer the door, Davey became concerned and contacted the authorities. Lorne Lally, a firefighter, responded to the scene and discovered Belmont's body lying on the floor blocking the front door. A tire iron covered with blood was found at the scene, along with an envelope bearing a bloody footprint. The police found two bottles of bleach in the victim's second-story bathroom even though the washing machine was located in the basement.

The forensics evidence revealed that Belmont had suffered multiple, severe blunt trauma wounds to his head, neck, shoulders and hands. The pathologist opined that an object such as a tire iron could have caused the injuries sustained. The blood-stained sneakers confiscated from Rogers were found to have Belmont's blood on the soles as well as the uppers and the laces. The sneakers also bore a tread pattern similar to that on the blood-stained envelope found at the victim's house. Finally, Rogers's shoes were discolored as if they had been bleached. The bloody

clothes found at Rogers's house were found to have type-O bloodstains. Testing revealed that Belmont had type-O blood, but Rogers's blood was type-A. Scrapings taken from underneath Rogers's fingernails yielded human blood.

At trial, Rogers admitted that he had been at Belmont's house early in the evening of July 22. He stated that he left for a while and then returned later that night to check on Belmont. When he arrived the second time, he noticed that the front door was slightly ajar. He recounted that as he entered the house, he stumbled over Belmont's body and nearly lost his balance. He felt Belmont's back and, upon looking down, noticed that Belmont's head had been crushed. Rogers testified that, panicked and in a state of shock, he stumbled back out the door, got into his car and drove home. He claimed that he sat in his car, in a stunned daze, until his wife came out and found him.

Ricky Rogers, the petitioner's son, admitted that he gave a statement to the police on July 23. When shown the statement by the prosecutor at trial, Ricky denied that it helped to refresh his recollection about what he had said to the police. The statement was not admitted into evidence, although the jury, through the prosecutor's questions, heard that Rogers's wife had been trying to reach him by phone that evening and that she and Ricky left the house at 1 a.m. to look for Rogers. Ricky ultimately admitted on direct that Rogers was not home on the night of July 22 and that he and his mother went looking for him. Defense counsel elicited testimony from Ricky that Rogers did not have a tire iron in his car. Ricky also stated that Belmont had complained to him about a man who had come over to his house on several occasions and bothered Belmont about a missing check.

The defense called a mechanic named David Kneeple who related that he had been with

-4-

Rogers when Rogers originally purchased his taxicab. Accoring to Kneeple, there was no tire iron in the trunk when Rogers bought the car. Mary Jane Willimott, one of Rogers' acquaintances, testified that several months prior to the murder she had gotten a flat tire and asked Rogers for help. She recounted that Rogers had told her that he needed to use her equipment to change the tire because he did not have a tire iron.

At the close of the proofs, the court, *sua sponte* and over the prosecutor's objection, dismissed the count of the indictment charging depraved indifference murder on the basis that it was inappropriate given the overwhelming evidence of intent. The court also dismissed the fifth count of the indictment charging criminal possession of a weapon on the ground that it was redundant. The jury returned a verdict convicting Rogers of felony murder and first degree robbery. Rogers was sentenced to an indeterminate term of twenty-five years to life imprisonment.

Represented by different counsel, Rogers appealed his conviction to the Appellate Division, Fourth Department, of New York State Supreme Court. Rogers submitted a *pro se* supplemental appellate brief. The Fourth Department unanimously affirmed his conviction on November 13, 2000. *People v. Rogers*, 277 A.D.2d 876 (App. Div. 4th Dept. 2000). The New York Court of Appeals denied leave to appeal on May 4, 2001. *People v. Rogers*, 96 N.Y.2d 834 (N.Y. 2001). Rogers collaterally attacked his conviction in a motion to vacate the judgment pursuant to New York Criminal Procedure Law § 440.10; that application was pending from September 18, 2001, until March 27, 2002.

Rogers filed the instant federal habeas petition on December 9, 2002. Respondent concedes that all of the claims raised herein are fully exhausted, *see* 28 U.S.C. § 2254(b)(1). For

the reasons that follow, the petition is denied.

## DISCUSSION

### I.      Standard of Review

To prevail under 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective

Death Penalty Act ("AEDPA") in 1996, a petitioner seeking federal review of his conviction

must demonstrate that the state court's adjudication of his federal constitutional claim resulted in

a decision that was contrary to or involved an unreasonable application of clearly established

Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual

determination in light of the evidence presented in state court.  *See* 28 U.S.C. § 2254(d)(1), (2);

*Williams v. Taylor*, 529 U.S. 362, 375-76 (2000).

### II.     Merits of the Petition

#### A.      Violation of the Double Jeopardy Clause

Rogers argues that his second trial for his step-father-in-law's murder was barred by the

Double Jeopardy clause of the Fifth Amendment to the Constitution. At his first trial, which

ended in a mistrial, the prosecutor had asked one of the arresting officers whether the officer's

contact with Rogers "involve[d] any type of interview or anything at that point?" The officer

stated, "There was [*sic*] five photos taken of his body and he [Rogers] requested then to talk to a

lawyer." Before defense counsel could object, the court immediately told the jury to disregard the

comment about Rogers' request for counsel. The officer's answer prompted defense counsel to

move for a mistrial, but the court denied the application.

Later, the prosecutor asked Rogers' daughter the following question: "Has that subject

matter [Rogers being charged with the murder of the witness' step-grandfather] been the subject

matter of any family discussions regarding what happened to [the step-grandfather]?" Upon defense counsel's prompt objection, the witness was directed not to answer and the jury was removed from the courtroom. The prosecutor explained to the judge that he asked the question because the witness had denied at the grand jury that the family had engaged in any discussions about Rogers' arrest. Defense counsel argued that the question and the prospective answer would allow the jury "to somehow infer . . . that something's wrong when a family doesn't talk about it." The court agreed, observing that the question appealed to something other than the jury's logic and was unfair and prejudicial. Accordingly, defense counsel's motion for a mistrial was granted.

Rogers contends that the conduct of the prosecutor at his first trial was so egregious as to bar his retrial under the Double Jeopardy clause of the Constitution. The Appellate Division rejected this claim on direct appeal.

"Analysis of double jeopardy begins with the language of the Fifth Amendment and the rights it aims to safeguard." *United States v. Pavloyianis*, 996 F.2d 1467, 1472 (2d Cir. 1993). The Fifth Amendment states that "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. One of the rights to which a defendant typically is entitled under the Double Jeopardy clause "is to have his trial completed in and by the particular tribunal where he is presently on trial, except where in the trial court's discretion, the right must give way to the public interest in having 'fair trials designed to end in just judgments.'" *Id.* (quoting *Wade v. Hunter*, 336 U.S. 684, 689 (1949)). Thus, double jeopardy also protects against prosecutorial misconduct and judicial overreaching. *See id.*

As the Second Circuit has explained, "[t]he key double jeopardy policy aimed to be

protected where there has been prosecutorial or judicial error is to retain for the defendant primary control over whether he wants to continue on trial where he is, thereby avoiding the expense and anxiety of a lengthy appeal and possible retrial, or whether he wants to end that trial in light of the taint in the proceedings." *Id.* at 1473 (citing *United States v. Dinitz*, 424 U.S. 600, 608-09 (1976)). In determining whether double jeopardy bars re-prosecution, the "crucial question" is whether the prosecutor engaged in the misconduct in order to prejudice the defendant's chance of obtaining an acquittal or to "goad" him into moving for a mistrial. *Dinitz*, 424 U.S. at 611 ("[The Double Jeopardy Clause] bars retrials where 'bad-faith conduct by judge or prosecutor,' threatens the '[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict' the defendant.") (citation omitted).  If such deliberate misconduct is found, the Double Jeopardy Clause has been violated. *Id.*

The Supreme Court circumscribed the *Dinitz* rule regarding the effect of a defendant-initiated mistrial on a claim of double jeopardy in *Oregon v. Kennedy*, 456 U.S. 667 (1982). Under the rule set forth in *Kennedy*, a defendant who has moved for and been granted a mistrial may successfully invoke the Double Jeopardy Clause to prevent a second prosecution only when the prosecutor's misconduct that precipitated the mistrial was intended to "goad" or provoke the defendant into moving for the mistrial. *Id.* at 673; *see also id.* at 675-76 ("Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial *absent intent* on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause.") (emphasis supplied). Thus, the critical inquiry under this standard is whether the prosecutorial misconduct

-8-

was undertaken with the specific intent "to subvert the protections afforded by the Double

Jeopardy Clause." *Id.* at 676.

The Supreme Court has made clear that mere "bad faith conduct" or "harassment" on the

part of the prosecution is insufficient to preclude re-trial. *See Kennedy*, 456 U.S. at 679. Rather,

the state court must determine whether prosecutor actually intended to provoke a mistrial. *Id.*;

*accord United States v. Pavloyianis*, 996 F.2d at 1474 (requiring "deliberate" prosecutorial

misconduct); *see also United States v. Huang*, 960 F.2d 1128, 1133 (2d Cir. 1992) ("Negligence,

even if gross, is insufficient."). This standard "calls for the court to make a finding of fact."

*Kennedy*, 456 U.S. at 675.

> At the first trial, the judge explained to Rogers,
>
> Do you understand that you're not going to be able to claim double jeopardy? This
> is not – I'm not seeing this as an intentional violation of your rights by the
> government, at most accidental, I'm telling you that going in, I'm not – you're not
> going to win any claim on double jeopardy so you shouldn't have that in the back
> of your mind, saying, well, I'm going to keep that, that's a trump card.

On direct appeal, the state court similarly found that the prosecutor's misconduct prompting the

motions for a mistrial did not constitute that type of prosecutorial overreaching that would bar re-

prosecution. *People v. Rogers*, 277 A.D.2d at 876 (citations omitted). These factual findings by

the state courts are entitled to a presumption of correctness under 28 U.S.C. § 2254(e) that only

may be overcome upon a showing of clear and convincing evidence. This Rogers is unable to do

on the record before me.

In his brief on direct appeal, defense counsel pointed to some of the comments by the

judge showing disapprobation for the police officer who, despite the fact that he had twenty-five

years of experience, nevertheless gave the unsolicited comment that Rogers asked for an

attorney. It is evident from the trial transcript , however, that the judge's disapproval was

reserved for the police officer, not the prosecutor. Nevertheless, defense counsel suggested that

the police officer's behavior should be imputed to the state by arguing that the prosecutor was

attempting to have his witnesses "do the dirty work" for him and that such a maneuver should not

be tolerated. There is no basis in the record for making such an inference. Although the

prosecutor's open-ended question was carelessly crafted, it did not call for an improper response

by the officer. Moreover, even if the prosecutor neglected in his pre-trial preparation of the

officer to warn that it was impermissible to refer to Rogers' exercise of his privilege against

self-incrimination, the record provides no reason to suspect that the omission was deliberate.

Accordingly, Rogers' double jeopardy claim provides no basis for habeas relief.

### B. Failure to suppress statements to police and evidence seized at time of interrogation

Rogers contends that the initial stop by police of him in his driveway and the subsequent

questioning that occurred was impermissible. He further argues that the officers' seizure of his

blood-stained sneakers and other physical evidence was invalid. These arguments allege

violations of the Fourth Amendment's proscription against unreasonable searches and seizures

and, as such, are not cognizable on habeas review. *See Stone v. Powell*, 428 U.S. 465, 494 (1976)

(footnotes omitted) ("Where the State has provided an opportunity for full and fair litigation of a

Fourth Amendment claim, a state prisoner may not be granted habeas corpus relief on the ground

that evidence obtained in an unconstitutional search or seizure was introduced at his trial." ).

Rogers may not raise his Fourth Amendment claims on habeas review because he was

provided with, and indeed took full advantage of, the opportunity to fully adjudicate these

-10-

matters in state court. At the trial court level, defense counsel filed a motion contesting the

validity of the police officers' detention. Following a hearing, the court denied the motion to

suppress in a written opinion on the record setting forth its findings of fact and conclusions of

law. Defense counsel pressed Rogers' Fourth Amendment claims on direct appeal. The Appellate

Division rejected the claims, and the New York Court of Appeals found that there was no

question of law meriting further review. Rogers' various applications at the trial court and

appellate levels challenging his arrest clearly show that he was given an opportunity for a "full

and fair" litigation of his Fourth Amendment claims. Accordingly, these claims are not

cognizable on habeas review.

## C.      Insufficiency of the evidence

Rogers argues that the circumstantial evidence against him did not exclude to a moral

certainty every other reasonable hypothesis besides guilt and therefore was insufficient to support

a guilty verdict. On direct appeal, the state court held that the circumstantial evidence was

"legally sufficient" to establish Rogers's guilt.

As an initial matter, I note that the "moral certainty" standard is "available only to a trier

of fact." *People v. Williams*, 84 N.Y.2d 925, 926 (1994) ("A court reviewing legal sufficiency of

the trial evidence must instead determine whether any valid line of reasoning and permissible

inferences could lead a rational person to the conclusion reached by the fact finder on the basis of

the evidence at trial, viewed in the light most favorable to the People[.]").  The relevant question

for this Court on federal habeas review is whether, after viewing the evidence in the light most

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *accord*

*Dixon v. Miller*, 293 F.3d 74, 81 (2d Cir. 2002). Thus, a habeas petitioner "bears a very heavy burden" when challenging the legal sufficiency of the evidence in a state criminal conviction. *Einaugler v. Supreme Court*, 109 F.3d 836, 840 (2d Cir. 1997). On habeas review, the court is not permitted to "'make its own subjective determination of guilt or innocence.'" *Quartararo v. Hanslmaier,* 186 F.3d 91, 97 (2d Cir. 1999) (quoting *Herrera v. Collins,* 506 U.S. 390, 402 (1993)).

In the instant case, there was a fair amount of physical evidence found at the crime scene that linked Rogers to the murder. A tire iron covered in the victim's blood was found next to the body; when the police searched Rogers's vehicle, they found a tire jack but no tire iron. Also discovered near the body was an envelope with a bloody footprint on it; the tread on the footprint was similar to the pattern on Rogers's sneakers and the blood on the paper matched that of the victim. The police found two bottles of bleach in an upstairs bathroom even though the washing machine was downstairs; the soles of Rogers's sneakers appeared to have been scrubbed clean and were discolored, as if they had been bleached. In addition, his sneakers were spattered with the victim's blood. Clothes found at Rogers's house bore bloodstains of the same type as the victim; Rogers has a different type of blood. Finally, scrapings taken from underneath Rogers's fingernails yielded human blood.

Furthermore, a rational jury, presented with Rogers's three inconsistent accounts of his whereabouts on the night of the murder, could have found that Rogers was unable to satisfactorily explain his actions. The jury heard Rogers's initial statement to the police in which he stated that he was at home all evening and fell asleep watching television. However, there were three witnesses who placed Rogers at Belmont's house on the night of the murder at about 9

-12-

p.m. Rogers' employer testified that Rogers was out in his cab on the night of July 22. Rogers's

son Ricky admitted that his mother placed several calls to the cab company looking for Rogers.

Ricky testified that he and his mother went out looking for Rogers that night but were unable to

find him.

Confronted with the witnesses placing him at the victim's house, Rogers then told the

police that he and his wife had argued that evening; she left and he went out looking for her. At

trial, Rogers contradicted this statement, admitting that he had been at the victim's house while

the three boys were there. He claimed that he returned to the house later that evening and found

the victim already dead. Rogers could not explain why he left the house and never called the

authorities, stating, "I had no idea what to say to anybody."

As to the robbery charge, Davey, Belmont's step-grandson, testified that Belmont had a

"wad" of cash in his wallet. However, when Belmont's body was found, there was no wallet on

his person.

Viewed in the light most favorable to the prosecution, there was sufficient evidence upon

which a rational jury validly could reason that the elements of felony murder and robbery had

been proven beyond a reasonable doubt. The Appellate Division's conclusion that legally

sufficient evidence supported the verdict against Rogers was neither contrary to, nor an

unreasonable application, of clearly established Supreme Court precedent.

**D.    Ineffective assistance of counsel**

Rogers contends that trial counsel was ineffective for failing to utilize allegedly

exculpatory evidence; failing to move to dismiss the second indictment on the grounds that

principles of Double Jeopardy barred re-prosecution; and failing "to utilize the record of the first

trial to properly prepare for trial." Petition at 4 (Docket #1).

In order to prevail on a claim of ineffective assistance of counsel within the framework established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), a habeas petitioner must satisfy a two-part test. First, he must show that his attorney's performance "fell below an objective standard of reasonableness," *id.* at 688, and second, he must show that he was prejudiced by counsel's deficient representation, *see id.* at 694. In other words, a petitioner must demonstrate that there is a "reasonable probability" that but for counsel's error, the outcome would have been different, *id.* at 694. The issue of prejudice need not be addressed, however, if a petitioner is unable to demonstrate first that his counsel's performance was inadequate. "[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

### 1.    Failure to introduce exculpatory evidence

At Rogers's first trial, defense counsel elicited testimony that a palm print was found in the victim's bathroom but did not raise this issue at Rogers's second trial. Rogers claims that defense counsel erred in failing to introduce this allegedly exculpatory evidence.

When the police performed their investigation of the crime scene, they noted that the sink in the upstairs bathroom was spattered with what appeared to be blood, as if someone had washed at the sink. A *latent* palm print was recovered from the upstairs bathroom; the police report does not indicate that it was a bloody palm print.[1] Testing revealed that the print did not

---

[1] Respondent characterizes the palm print as "bloody" in its Memorandum of Law. *See* Respondent's Memorandum of Law at 3 (Docket #10). However, the police reports attached to Exhibit A of respondent's Notice of Motion (Docket #5) indicate that the palm print was latent, only appearing after the officers dusted the countertop with black powder. *See* Reports of Nicholas Paonessa and Kevin LoCicero, attached as part of Exhibit A to Docket #5. Because respondent neglected to in any way number the pages of the exhibit, the Court cannot provide a more accurate citation.

match Rogers's inked hand prints; unfortunately, the victim's inked palm prints were not available for comparison. *See* Police Reports, attached as part of Exhibit A to Respondent's Notice of Motion (Docket #5).

There is no indication in the record as to why defense counsel chose not to introduce this piece of evidence at Rogers's second trial. Even if it was error on the part of Rogers's attorney, it did not prejudice Rogers. In other words, there is no reasonable likelihood that the palm print, had it been introduced, would have raised a reasonable doubt in the jury's mind that did not otherwise exist. As discussed above, the prosecution had a strong case against Rogers: First, the murder weapon was a blood-stained tire iron; when the police searched Rogers' vehicle, they found a tire jack but no tire iron. An envelope marked with a footprint in the victim's blood on it was found near the victim's body, and the tread on the footprint was similar to the pattern on Rogers's sneakers. Two bottles of bleach were found in the upstairs bathroom; an unlikely place for them since the washing machine was downstairs. The police noticed that the soles of Rogers's sneakers appeared to have been scrubbed clean and were discolored, as if they had been bleached. In addition, both Rogers's sneakers and clothes found at Rogers's house were spattered with blood of the same type as the victim's; Rogers has a different blood-type. Finally, scrapings taken from underneath Rogers's fingernails yielded human blood.

Granted, the latent palm print was potentially exculpatory. However, it was of limited value since the print could have belonged to the victim. Furthermore, the physical evidence in the case, coupled with Rogers's inexplicable actions on the night of the murder and three inconsistent statements to the police, strongly linked Rogers to the murder. In the face the evidence against Rogers, the palm print was not of compelling weight. Because Rogers did not

suffer constitutional prejudice as a result of counsel's failure to introduce evidence of the latent palm print, the Court cannot grant habeas relief on Rogers's ineffective assistance of counsel claim.

**2.      Failure to file Double Jeopardy motion**

As discussed above, a motion to bar a second trial on double jeopardy grounds would not have been successful; the trial court specifically informed Rogers that he would be unable to prevail on a double jeopardy application, and, indeed, there is no legal basis for such a motion. Therefore, Rogers was not prejudiced by defense counsel's failure to make such an application. *See*, *e.g.*, *Erdheim v. Greiner*, 22 F. Supp.2d 291 (S.D.N.Y. 1998) ("Since petitioner has not proved that he had a meritorious speedy trial claim, there is no reasonable probability that his counsel's failure to raise the motion affected the outcome of the case."); *Walker v. Bennett*, 262 F. Supp.2d 26, 36 (W.D.N.Y. 2003).

**3.      Failure to utilize record from first trial properly**

Rogers' final contention is that counsel was deficient in failing "to utilize the record of the first trial to properly prepare for trial." That statement is the whole of his argument; Rogers provides no particulars as to what counsel should have gleaned from the first trial and used at the re-trial. Even construing Rogers' *pro se* papers liberally, this claim is too vague to state a proper claim for habeas relief and must be dismissed. In any event, I have reviewed the transcript and it is apparent that Rogers received competent representation from his attorney at trial.

## CONCLUSION

For the reasons stated above, Ernest Rogers' petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed.  Because Rogers has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of

appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

*/s/ Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:       May 13, 2005
             Rochester, New York.